# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CHRISTIAN D. PAYNE, an individual, | No. 58137-0-II |
| Appellant, | |
| v. | |
| WEYERHAEUSER COMPANY, a Washington corporation, WEYERHAEUSER NR COMPANY, a Washington corporation, AIRGAS, INC., a Delaware corporation, AIRGAS SAFETY, INC., a Delaware corporation, AIRGAS – NOR PAC, INC., a Delaware corporation and INDUSTRIAL SCIENTIFIC CORPORATION, a Pennsylvania corporation, | PUBLISHED OPINION |
| Respondents, | |
| AIRGAS USA, LLC, a Delaware limited liability company, | |
| Defendants. | |
| WEYERHAEUSER COMPANY, a Washington corporation, WEYERHAEUSER NR COMPANY, a Washington Corporation, | |
| Third-Party Plaintiffs, | |
| v. | |
| SAFWAY SERVICES, LLC, a Delaware corporation, | |
| Third-Party Defendant. | |

MAXA, J. – Christian Payne appeals the trial court's grant of summary judgment in favor of Weyerhaeuser Company and Industrial Scientific Corporation (ISC) in his lawsuit against them seeking damages for injuries he sustained while working as an independent contractor inside a chlorine dioxide tank at a pulp and paper mill Weyerhaeuser owned.

Payne worked for Safway Services LLC (Safway), a contractor specializing in scaffolding. Weyerhaeuser contracted with Safway to erect scaffolding in a chlorine dioxide storage tank (Tank #2) in order to complete regularly scheduled tank maintenance. Weyerhaeuser's contract required Safway to prepare a safety/loss plan and to ensure compliance with numerous safety requirements.

Safway gave Payne and his colleagues GasBadge Pro (GBP) air monitors to wear while they worked in Tank #2. ISC manufactured the GBP monitors, and Airgas USA LLC (Airgas) leased them to Safway. The GBP monitors were equipped with chlorine dioxide sensors and should have alerted if exposed to dangerous levels of chlorine dioxide. Payne worked in Tank #2 for about 30 minutes when he began to feel dizzy and left the tank. None of the GBP monitors alarmed until after Payne exited. He suffered severe respiratory injuries as a result of his exposure to chlorine dioxide in Tank #2.

Payne filed a lawsuit against Weyerhaeuser, ISC, and Airgas. Weyerhaeuser moved for summary judgment, arguing that it did not owe a duty to Payne because he was an independent contractor and Weyerhaeuser did not retain control over his work in Tank #2. Payne asserted a premises liability theory for the first time in response. ISC also moved for summary judgment, arguing that Payne failed to present specific evidence of a defect in the GBP monitors and failed to show that the monitors were defective when they left ISC's control. The trial court granted

Weyerhaeuser and ISC's motions for summary judgment. Payne subsequently settled his claims against Airgas.

We hold that (1) Weyerhaeuser did not owe a duty to Payne as an independent contractor because it did not retain control over the manner in which Safway performed its work, (2) Weyerhaeuser is not liable under a premises liability theory because it delegated to Safway its duty to guard against known or obvious dangers on the premises, (3) Weyerhaeuser is not liable under a *res ipsa loquitur* theory, and (4) ISC is subject to liability under a product liability theory because the GBP monitors' failure to go into alarm when exposed to high levels of chlorine dioxide raises a genuine issue of material fact as to whether they were reasonably safe.

Accordingly, we affirm the trial court's grant of summary judgment in favor of Weyerhaeuser, but we reverse the trial court's grant of summary judgment in favor of ISC and remand for further proceedings.

FACTS

*Background*

Weyerhaeuser owns a pulp and paper mill in Longview. Weyerhaeuser uses a chlorine dioxide solution to bleach the pulp as part of its manufacturing process. The Longview mill has two tanks that hold the chlorine dioxide solution. Periodically, Weyerhaeuser shuts down the mill for maintenance. In order to complete maintenance in the chlorine dioxide tanks, it is necessary to erect scaffolding inside them.

In 2008, Weyerhaeuser first hired Safway, a scaffolding contractor, to build scaffolding inside its tanks. Weyerhaeuser employees referred to Safway as a "non-supervised scaffolding contractor" during testimony. The contract between Weyerhaeuser and Safway contained a safety provision, which stated as follows:

3

Safety; Familiarity with Site. Supplier understands that safety is a high priority. Supplier also acknowledges that the Site is used for industrial operations and maintained only to standards required for such use. *Prior to the commencement of Services, Supplier will, at its own expense, become familiar with the Site, its operations and any safety rules or guidelines set forth in Attachment D or provided to Supplier from time to time.* In addition to any Site specific safety guidelines, Supplier will meet all OSHA[1] and other applicable Federal and state regulatory agency requirements regarding safety. Supplier represents and warrants that any employee and subcontractor (used in performance of Services) will be adequately trained and at all times comply with the above-listed standards and any other requirements of this contract.

CP at 28 (emphasis added).

Attachment D to the contract set forth "Contractor Safety Requirements." CP at 40. Attachment D stated, "Contractor is responsible for ensuring that all Contractor employees, their Subcontractor employees and Supplier employees meet the following requirements." CP at 40.

Attachment D also stated that Safway was required to (1) provide Weyerhaeuser a copy of a written "Safety/Loss Program," which had to include 16 categories such as "respiratory protection," "confined space," and personal protective equipment; (2) ensure that Safway employees had received training, including "[a]t least one OSHA approved [training] program or other program(s)" accepted by Weyerhaeuser as well as department and job specific orientations; (3) provide Weyerhaeuser with a list of all employees scheduled to be on site, including verification that they had received the required safety training; (4) provide specific safety supervision; and (5) ensure that all employees comply with WISHA[2] safety standards and Weyerhaeuser's policies and procedures. CP at 40. Safway also was required to "[p]rovide all necessary safety equipment, education, training, and devices necessary to safely perform work." CP at 40.

---

[1] Occupational Safety and Health Administration.

[2] Washington Industrial Safety and Health Act of 1973, ch. 49.17 RCW.

Nothing in the contract stated that Weyerhaeuser had any authority or control over the manner in which Safway completed its scaffolding work.

Weyerhaeuser required all of its contractors to comply with their confined space entry permit when they worked within confined spaces on the jobsite. Weyerhaeuser filled out the permit. The permit identified the confined space that the contractor planned to enter, the purpose of entry, PPE requirements, atmospheric test requirements, and entry hazards. It also contained a checklist for the entry coordinator to complete "immediately prior to initial entry." CP at 94. A Weyerhaeuser employee generally served as the entry coordinator for purposes of the permit.

The space entry permit included a log for "confined space attendant" to sign in. CP at 95. The confined space attendant was in charge of ensuring that all permit conditions were met before employees enter the confined space. The permit also included an "atmospheric test log" that required atmospheric tests initially, before every entry into the tank, every two hours during the job, and each time the job was discontinued for more than 30 minutes. CP at 95. The atmospheric testing log provided that attendants should test for oxygen, hydrogen sulfide, carbon monoxide, chlorine, and lower explosive limit (LEL). There was no specific test for chlorine dioxide, but chlorine is a byproduct of chlorine dioxide.

Before any scheduled maintenance, Weyerhaeuser would prepare the chlorine dioxide tanks to ensure they were safe for entry. According to Weyerhaeuser's written procedure, Weyerhaeuser was to (1) isolate Tank #2 from Tank #1 to ensure that chlorine dioxide would not leak between the tanks, (2) empty Tank #2 of chlorine dioxide, (3) dechlorinate the tank using a mixture of water, peroxide, and caustic, (4) rinse the tank, and (5) drain the tank. The cleaning process takes two days, and could require an additional 24 hours to ventilate the air inside the tank before it is safe for entry.

*Personal Air Monitors and Chemical Gases*

ISC sold the four GBP monitors in use at the time of the incident to Airgas no later than December 31, 2008. Airgas rented the monitors to Safway for their employees to wear while working inside Tank #2. The GBP monitors had sensors that could detect chlorine dioxide, and would alarm if they detected a gas concentration higher than the set alarm thresholds. ISC established default set points for the GBP monitors for various gases. ISC's default low alarm and high alarm set points for chlorine dioxide were 0.10 parts per million (ppm) and 0.20 ppm, respectively. These default set points were in accordance with those recommended by OSHA and the Association Advancing Occupational and Environmental Health.

Chlorine dioxide has an odor threshold of 0.30 ppm. Chlorine dioxide smells like chlorine or ozone. In addition, gases have different weights. This means that if gases are in the atmosphere of a confined space, they tend to settle at different levels within the space depending on conditions like heat and humidity.

*Safway's Work in Tank #2*

On March 2, 2011, Weyerhaeuser took Tank #2 out of service. The next day, Weyerhaeuser filled the tank with a mixture of hydrogen peroxide and water. They did not use a caustic to clean the tank. They then rinsed and drained the tank and ventilated the tank for two days. Weyerhaeuser scheduled Safway to perform scaffolding work in Tank #2 on March 8.

Weyerhaeuser required Safway employees to undergo training before they entered Weyerhaeuser property. A Safway employee was the trainer. The training consisted of watching a video provided by Weyerhaeuser and taking a test.

On March 8, Tom Argyropoulos, a Weyerhaeuser employee, was the entry coordinator for Tank #2 pursuant to the confined space entry permit. At 7:50 AM, Argyropoulos checked the

atmosphere in the tank, using a six foot attachable air wand while he stood outside the tank. Argyropoulos tested for oxygen, hydrogen sulfide, carbon monoxide, chlorine, and LEL. His testing revealed that there were safe levels of each chemical in the entry of the tank. Rich Huhtala, a Safway employee, was present for the testing.

At 7:56 AM, Huhtala signed in as the confined space attendant under the confined space entry permit. At that point, Argyropoulos turned things over to Safway and left the area in control of Huhtala. Huhtala's responsibility was to perform his own testing and to ensure that it was permissible for workers to enter the tank. The entry permit does not reflect that Huhtala conducted additional atmospheric testing once he took over. However, Huhtala stated that he checked the atmosphere inside the tank before anyone entered.

Payne, Larry Fleming, and Jason Waddington entered Tank #2. CP 103. They each wore a GBP personal air monitor outfitted to detect chlorine and a rescue respirator. When the Safway employees entered the tank, they encountered the smell of chlorine. None of the GBP monitors alarmed when they entered the tank.

The men were in the tank for between 30 and 40 minutes when Payne began to feel symptoms. Payne later explained that he started to feel bad shortly after he started working on the second-floor deck of the scaffolding, 15 feet up off the bottom of the tank. His throat began to itch, he struggled to speak, and he got dizzy. He told Fleming and Waddington that he needed to get out of the tank, and he climbed down from the scaffolding and exited the tank. Payne's monitor alarmed after he exited the tank, and showed a reading of 3.75 ppm. Fleming and Waddington remained in the tank. While still working in the tank, Waddington's GBP monitor

alarmed.[3]  At that time, Waddington and Fleming exited the tank.  Upon exiting the tank, all three men were coughing.

The employees reported the incident to Weyerhaeuser, and then went to Safway's designated break area at the jobsite.  Other Safway employees commented that the men smelled like chlorine.  The men went to a wellness clinic.  Fleming did not experience any symptoms, and the clinic discharged him.  However, the clinic sent Payne and Waddington to the hospital, where they remained under observation for two days before being released.

Payne continued to suffer symptoms from chlorine dioxide exposure, including excessive coughing and wheezing.  He was diagnosed with bronchiolitis obliterans and upper airway injuries.

*GBP Monitors in Tank #2*

Payne, Fleming, Waddington, and Huhtala each wore GBP monitors, identified as GBP 1 through GBP 5.[4]  The monitors had low alarm settings for chlorine dioxide at 0.2 ppm and high alarm settings at 0.50 ppm.  According to reports provided by ISC, two of the GBP monitors worn inside Tank #2 recorded concentrations of chlorine dioxide above the pre-set low and high alarm settings.  GBP 1 recorded a minimum concentration of chlorine dioxide of 0.48 ppm and a maximum of 0.61 ppm.  GBP 5 recorded a minimum concentration of chlorine dioxide of 0.89 ppm and a maximum of 1.10 ppm.  GBP monitors 2 and 4 did not detect any chlorine dioxide.

ISC presented evidence that two of the monitors detected chlorine dioxide limits that would have put the monitors into alarm, but then the monitors were switched off less than two

---

[3] Payne testified that he heard both Fleming and Waddington's monitors alert while they were inside the tank.  However, Fleming testified that Waddington's alarm went off, but his did not.

[4] The record does not indicate which person wore which monitor.

minutes later. This happened several times over 24 minutes for one monitor and 33 minutes for the other monitor.

As noted above, ISC's final inspection of the monitors before they were sold to Airgas had low alarm settings at 0.10 ppm and high alarm settings at 0.20 ppm. By the time of the incident, the settings had been changed to 0.20 ppm and 0.50 ppm. Safway employees stated that they did not change the settings. The presumption is that Airgas changed them.

*Trial Court Proceedings*

In February 2014, Payne filed a lawsuit against Weyerhaeuser, ISC and Airgas, alleging negligence against Weyerhaeuser and Airgas and alleging that ISC provided gas monitors that were defective and not reasonably safe. Payne's allegations regarding Weyerhaeuser included (1) failing to properly clean the tank, (2) failing to ensure that the tank was free from harmful chemicals before permitting Safway employees to enter, (3) providing an unsafe work environment for Safway employees, and (4) failing to comply with various state, local and federal regulations. He also claimed that Weyerhaeuser was liable under the doctrine of res ipsa loquitur. Payne did not state that Weyerhaeuser was liable under a premises liability theory.

Payne alleged that ISC sold defective gas monitors that were not reasonably safe, and that it was liable to him under theories of negligence and strict liability.

In January 2018, Weyerhaeuser moved for summary judgment, arguing that it did not owe a duty to Payne as an independent contractor because it did not retain control over the manner in which Safway performed its work. Weyerhaeuser also argued that res ipsa loquitur did not apply because it did not have exclusive control over Tank #2.

In opposition to summary judgment, Payne argued that as the owner of the jobsite, Weyerhaeuser owed a duty to Payne to provide a safe workplace because Weyerhaeuser retained

the right to control Safway's work. He argued that Weyerhaeuser retained control over Safway's work in Tank #2 by providing job specific training, coordinating the safety protocols at the job site, mandating that Safway comply with the confined space entry permit, and preparing Tank #2 for entry by Safway employees. Payne also argued that Weyerhaeuser was liable under *res ipsa loquitor*.

In addition, Payne argued that Weyerhaeuser owed him a duty under the business invitee theory of premises liability. He claimed that Weyerhaeuser, as a landowner, was liable because Tank #2 was hazardous to business invitees like Payne and Weyerhaeuser should have expected that Payne would not discover the danger of the chlorine dioxide in Tank #2. In reply, Weyerhaeuser pointed out that Payne had not pleaded a premises liability theory in his complaint. However, Weyerhaeuser did not object to Payne raising the issue and proceeded to argue Payne's premises liability claim on the merits.

In February 2018, ISC also moved for summary judgment. It argued that that Payne offered no evidence that any of the monitors were defective when they left ISC's control. In the alternative, ISC argued that because none of the air monitors contained sensors to monitor all of the known hazards in Tank #2, Payne could not establish a claim against them.

In opposition, Payne argued that ISC was strictly liable under the design defect theory of product liability. He argued that the GBP monitors were more dangerous than the ordinary consumer would expect. Payne submitted the deposition of Dr. David Atwood in support of his argument.

In March 2018, the trial court entered orders granting Weyerhaeuser's and ISC's motions for summary judgment. The court orally ruled that Weyerhaeuser did not retain control of Safway's work and did not owe a duty to Payne. The trial court also commented "I do believe

there's a public policy element to this, that those kinds of restrictions on what to do, what you can do before you're allowed to start your job are functionally, factually, legally different than restrictions on how you actually do your job." RP at 28-29. Regarding ISC, the court suggested that ISC could not be held liable because the set points on the GBP monitors were different than when they left ISC's control.

In March 2023, the trial court entered a stipulation and agreed order dismissing Payne's claims against Airgas.

Payne appeals the trial court's orders granting Weyerhaeuser's and ISC's motions for summary judgment.

## ANALYSIS

A.    SUMMARY JUDGMENT STANDARD

We review summary judgment orders de novo. *Mihaila v. Troth*, 21 Wn. App. 2d 227, 231, 505 P.3d 163 (2022). We view all evidence in the light most favorable to the nonmoving party, including reasonable inferences. *Id.* Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id.* A genuine issue of material fact exists if reasonable minds can come to different conclusions on a factual issue. *Id.*

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Sartin v. Est. of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020). A moving defendant can meet this burden by demonstrating that the plaintiff cannot support their claim with any competent evidence. *Id.* If the defendant makes such a showing, the burden shifts to the plaintiff to present evidence that creates a genuine issue of material fact. *Id.* "Summary judgment is appropriate if a plaintiff fails to show sufficient evidence that creates a

question of fact about an essential element on which he or she will have the burden of proof at trial." *Id.*

B.      WEYERHAEUSER'S DUTY AS JOBSITE OWNER

Payne argues that the trial court erred in granting summary judgment in favor of Weyerhaeuser because Weyerhaeuser retained control over Safway's work, and therefore owed him a duty even though he was an employee of an independent contractor. We disagree.

1.      Legal Principles

The threshold determination in a negligence claim is the existence of a duty – whether the defendant owed the plaintiff a duty. *Turner v. Dep't of Soc. & Health Servs.*, 198 Wn.2d 273, 284, 493 P.3d 117 (2021). The existence of a duty is a question of law that we review de novo. *Id.*

A jobsite owner's duty is determined with reference to a general contractor's duty. *Afoa v. Port of Seattle*, 191 Wn.2d 110, 121, 421 P.3d 903 (2018) [*Afoa* II]. "Under the common law, a general contractor owes a duty to all employees on a jobsite to provide a safe place to work in all areas under its supervision." *Vargas v. Inland Wash., LLC*, 194 Wn.2d 720, 730, 452 P.3d 1205 (2019). Despite this rule, a general contractor on a worksite who hires an independent contractor to perform certain work generally is not liable for injuries to the employees of that independent contractor. *Id.* at 731. But if a general contractor hires a subcontractor and retains control over the work performed, the general contractor has a common law duty within the scope of control to provide a safe workplace. *Id.*

In addition to the common law duty, a general contractor has a statutory duty to provide a safe workplace. *Vargas*, 194 Wn.2d at 735. Under RCW 49.17.060(2), general contractors have a duty to ensure compliance with WISHA regulations. *Vargas*, 194 Wn.2d at 735. For general

contractors, this statutory duty extends to all employees working at the jobsite regardless of whether the general contractor retains control over the jobsite. *Id.* at 735-36.

Jobsite owners also may owe the same common law and statutory duties as general contractors to provide a safe workplace. *Afoa* II, 191 Wn.2d at 121. Like general contractors, jobsite owners have a common law duty to the employees of independent contractors if they "retain[] control over the manner in which work is done on a work site." *Afoa v. Port of Seattle*, 176 Wn.2d 460, 478, 296 P.3d 800 (2013) [*Afoa* I]. However, unlike general contractors, "jobsite owners have a duty to comply with WISHA only if they retain control over the manner in which contractors complete their work." *Id.* at 472.

The Supreme Court has expressed the retained control rule in slightly different ways. In *Kamla*, the court referred to whether the jobsite owner "retains control over the manner in which the employee works." 147 Wn.2d at 119. In *Afoa* I, the court cited *Kamla* in referring to jobsite owners' liability under WISHA when they "retain control over the manner in which contractors complete their work." 176 Wn.2d at 472. Later, the court stated that jobsite owners must comply with WISHA regulations "if they retain control over the manner and instrumentalities of work being done on the jobsite." *Id.* Regarding common law liability, the court referred to the jobsite owner retaining "the right to control work." *Id.* at 477; *see also Afoa* II, 191 Wn.2d at 121 ("degree of control over the work").

In *Kamla*, the court quoted with approval from a comment to section 414 of *Restatement (Second) of Torts*, which states, "[T]he employer must have retained at least some degree of control over the manner in which the work is done. . . . There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (AM. L. INST. 1965).

For purposes of this retained control rule, " '[t]he test of control is not the actual interference with the work of the subcontractor, but the right to exercise such control.' " *Vargas*, 194 Wn.2d at 731 (quoting *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 330-31,582 P.2d 500 (1978)). Stated differently, "the proper inquiry becomes whether there is a retention of the right to direct the manner in which the work is performed, not simply whether there is an actual exercise of control over the manner in which the work is performed." *Kamla*, 147 Wn.2d at 121.

*Kamla* is instructive. In that case, the plaintiff was an employee of Pyro, an independent contractor that Space Needle hired to set up a fireworks display. *Kamla*, 147 Wn.2d at 117-18. While working at the 200-foot level of the Space Needle, the plaintiff was injured when he dragged his safety line across an open elevator shaft and it got caught in the elevator and pulled him down the shaft. *Id.* at 118. The plaintiff sued Space Needle, arguing that they owed him a duty because they retained control over the worksite. *Id.* at 117. The court noted that Space Needle provided a display site for the fireworks and a fallout zone, paid the permit fees, provided access to the site and technical assistance, and provided security. *Id.* at 122.

The court focused on whether Space Needle had "the right to interfere with the manner in which Pyro completed its work." *Id.* at 121. The court stated, "Space Needle did not retain control over the manner in which Pyro installed the fireworks display or completed its work. As an independent contractor, Pyro was free to do the work in its own way." *Id.* at 122. The court held that Space Needle did not owe the plaintiff a common law duty. *Id.* For the same reason, Space Needle did not have a duty to comply with WISHA regulations. *Id.* at 125.

2.    Duty Analysis

Weyerhaeuser owed a duty to Payne only if it retained the right to control the manner in which Safway performed its work in Tank #2. *See Afoa* I, 176 Wn.2d at 472. We conclude that Weyerhaeuser did not retain the right to control Safway's work and therefore did not owe a duty to Payne.

Initially, there is no evidence that Weyerhaeuser had the right to control any aspect of the work Safway contracted to perform – the installation of scaffolding inside of Tank #2. Weyerhaeuser contracted with Safway because Safway had expertise and experience in installing scaffolding in its tanks. As in *Kamla*, Safway was an independent contractor that was free to install the scaffolding in its own way. *See Kamla*, 147 Wn.2d at 122.

In addition, Weyerhaeuser did not control the entry of the Safway employees into the tank. After conducting initial testing, the Weyerhaeuser employee left the area and turned over control to a Safway employee. Safway then determined whether it was safe for its employees to enter.

However, Payne argues that Weyerhaeuser exercised control over its work by imposing specific safety requirements in Attachment D to the contract and in the confined space entry permit. Payne argues that these specific requirements show that Weyerhaeuser exercised control over the safety aspects of Safway's work. He claims that Weyerhaeuser supervised and controlled Safway's work through Attachment D and the confined space entry permit.

Initially, we note that confined space entry permits were not something that only Weyerhaeuser required – they are required by WISHA. WAC 296-307-65002, -65004. In addition, Payne focuses on the requirement of ongoing testing when workers are a confined space as an element of control, but the WISHA-mandated confined space entry permit requires

15

the recording of initial and periodic tests. WAC 296-307-65004(1)(f). And WAC 296-307-65012 requires both preentry testing and subsequent testing for toxic gases.

Jobsite owners insisting that an independent contractor comply with WISHA safety standards or permits or even their own safety requirements does not mean that they retain control over the manner in which the independent contractor performs its work. *Afoa* I, 176 Wn.2d at 481. Retained control necessarily focuses on the specific work the contractor was hired to perform – here, installation of scaffolding – not on safety requirements. This conclusion is consistent with the Supreme Court's statement in *Afoa* I: "Certainly, not every licensor or jobsite owner takes on a common law duty to maintain a safe workplace any time it requires on-site workers to comply with safety rules and regulations." *Id.*

The court in *Afoa* I acknowledged that retained control may exist when a jobsite owner "undertakes to control worker safety in a large, complex work site like Sea-Tac Airport." *Id.* In other words, a jobsite owner retains control if the owner is responsible for enforcing the safety requirements. But here, Weyerhaeuser did not "undertake to control worker safety" or to monitor its safety requirements. The contract and Attachment D stated that *Safway*, not Weyerhaeuser, was responsible for ensuring that the safety requirements were being followed. *Safway*, not Weyerhaeuser, was responsible for developing a detailed safety plan. And the confined space entry permit contemplated that Safeway would assume control of the work on Tank #2 once initial testing was completed. In other words, Weyerhaeuser did not retain control over implementation of the safety requirements. That control was transferred to Safway.

Payne argues that a jobsite owner can owe a duty not only by controlling the manner in which the independent contractor performs its work, but by generally maintaining control over the "workplace." The court in *Afoa* I mentioned this concept: "Under our common law safe

16

workplace doctrine, landowners and general contractors that *retain control over a work site* have a duty to maintain safe common work areas." 176 Wn.2d at 475 (emphasis added). But this concept appears to be limited to unique work sites like Sea-Tac Airport, where the Port of Seattle necessarily has extensive control over the entire area. Otherwise, the cases are clear that retained control is based on control over the manner in which work is performed. *Afoa* II, 191 Wn.2d at 121; *Afoa* I, 176 Wn.2d at 472; *Kamla*, 147 Wn.2d at 119; RESTATEMENT (SECOND) OF TORTS § 414 cmt. c.

In any event, the workplace here is Tank #2. The evidence is clear that Weyerhaeuser did not retain control over the tank once it was emptied and cleaned. A Weyerhaeuser employee performed initial air testing of the tank, but once that testing was done control of the tank was turned over to Safway to perform the contracted work.

Payne also argues that Weyerhaeuser retained control of the work site because only Weyerhaeuser was able to operate Tank #2's ventilation system while Safway was working. But merely operating a ventilation system for the tank does not indicate that Weyerhaeuser retained control over the manner in which Safway performed its work.

Finally, Payne argues that the trial court improperly based its ruling on Weyerhaeuser's motion for summary judgment on "public policy" grounds. Br. of App. at 27-34. However, this court reviews summary judgment orders de novo. *Mihaila*, 21 Wn. App. at 231. Therefore, the trial court's stated reasons for its ruling during oral argument are irrelevant to our analysis.

Accordingly, we reject Payne's argument that Weyerhaeuser retained control over Safway's work and hold that the trial court did not err in granting summary judgment in favor of Weyerhaeuser on Payne's jobsite owner liability claim.

17

C.      PREMISES LIABILITY CLAIM AGAINST WEYERHAEUSER

Payne argues that the trial court erred in granting summary judgment in favor of Weyerhaeuser because Weyerhaeuser owed a duty to Payne as a business invitee on its premises. Weyerhaeuser argues that this court should decline to consider this argument because Payne did not assert this claim in his complaint. We will consider this claim, but we conclude that Weyerhaeuser is not liable because it properly delegated to Safway its duty to protect Payne from known or obvious dangers.

1.      Consideration of Claim

Payne argues that his complaint can be interpreted as asserting a premises liability claim. He also contends that even if he did not plead the claim, the issue was argued by implied consent of the parties in the summary judgment proceedings and we should treat the claim as if it had been raised in the complaint pursuant to CR 15(b). We agree with the CR 15(b) argument.

The complaint arguably did not assert a premises liability claim. However, we can consider Payne's premises liability claim under CR 15(b), which states, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

Here, Weyerhaeuser moved for summary judgment, arguing that it did not retain control of Safway's work and therefore owed no duty to Payne. In opposition to Weyerhaeuser's motion for summary judgment, Payne argued that Weyerhaeuser owed him a duty as a business invitee under a premises liability cause of action. In its reply in support of its summary judgment motion, Weyerhaeuser pointed out that this was the first time that Payne had raised the business invitee argument. But Weyerhaeuser did not object to Payne raising the issue. Instead, Weyerhaeuser proceeded to address the premises liability claim on the merits. At oral argument,

Payne argued that there was a basis for liability under the premises liability theory. However, neither Weyerhaeuser nor the trial court addressed the argument during oral argument.

This case is similar to *Reagan*, 7 Wn. App. 2d 781. In that case, the plaintiff raised an unpleaded claim for the first time in her response to the defendant's summary judgment motion. *Id*. at 804. At oral argument, the defendant did not object to the plaintiff raising the claim. *Id*. Instead, the defendant argued the claim on the merits and discussed relevant case law during the argument. *Id*. This court held that because the defendant failed to object to the plaintiff raising the claim and proceeded to argue the claim on the merits, the summary judgment proceedings amounted to a trial by implication under CR 15(b).

As in *Reagan*, Weyerhaeuser did not object to Payne raising the premises liability claim for the first time. And Weyerhaeuser addressed the claim in its reply brief, spending two pages citing to cases and arguing why the claim should fail. Accordingly, we hold that the premises liability claim was tried by implied consent of the parties under CR 15(b).

> 2.    Liability for Obviously Dangerous Condition

Payne argues that the trial court erred in granting summary judgment in favor of Weyerhaeuser because Weyerhaeuser owed a duty to Payne as a business invitee. We disagree.

> a.    Standard of Liability

A landowner's duty to a person entering their property under premises liability law depends on whether the person is a trespasser, a licensee, or an invitee. *Afoa* II, 176 Wn.2d at 467. The employees of an independent contractor hired by the landowner are invitees. *Kamla*, 147 Wn.2d at 125. Weyerhaeuser concedes that Payne was a business invitee.

For business invitees, we apply the standard stated in the *Restatement (Second) of Torts* § 343 and § 343A. *Eylander v. Prologis Targeted U.S. Logistics Fund, LP*, 2 Wn.3d 401, 408, 539 P.3d 376 (2023). Section 343 states:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> (c) fails to exercise reasonable care to protect them against the danger.

RESTATEMENT § 343.

Under this section, an invitee "is . . . entitled to expect that the possessor will exercise reasonable care to make the land safe for his entry," which includes checking for unsafe conditions, "followed by such repair, safeguards, or warning as may be reasonably necessary for [the invitee's] protection under the circumstances." *Id*. cmt. b; *see Eylander*, 2 Wn.3d at 408. "An invitee is entitled to expect that the possessor will take reasonable care to ascertain the actual condition of the premises and, having discovered it, either to make it reasonably safe by repair or to give warning of the actual condition and risk involved therein." RESTATEMENT § 343 cmt. d.

However, "[s]uch a duty does not render a landowner 'a guarantor of safety – even to an invitee.' " *Eylander*, 2 Wn.3d at 408 (quoting *Mucsi v. Graoch Assocs. Ltd. P'ship No. 12*, 144 Wn.2d 847, 860, 31 P.3d 684 (2001)). "This means that a landowner does not need to deliver a jobsite free from hazards." *Eylander*, 2 Wn.3d at 408.

We apply § 343A(1) of the *Restatement* when the dangerous condition is known or obvious to the invitee. *Mihaila*, 21 Wn. App. 2d at 233. Section 343A(1) states that "a possessor of land is not liable to his invitees for physical harm caused to them by any activity or

condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." RESTATEMENT § 343A(1).

The general rule under § 343A(1) is that a landowner is not liable to an invitee for obvious dangers. *Mihaila*, 21 Wn. App. 2d at 233-34. The reasoning behind this rule is:

> *If [the invitee] knows the actual conditions, and the activities carried on, and the dangers involved in either*, he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the land. *The possessor of the land may reasonably assume that he will protect himself by the exercise of ordinary care, or that he will voluntarily assume the risk of harm if he does not succeed in doing so.* Reasonable care on the part of the possessor therefore does not ordinarily require precautions, or even warning, against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them.

RESTATEMENT § 343A cmt. e (emphases added).

In *Eylander*, the Supreme Court recently addressed a jobsite owner's liability under a premises liability theory when the owner hires an independent contractor to perform obviously dangerous work. 2 Wn.3d at 403-04. The court held that a jobsite owner can satisfy its duty to business invitees regarding known or obvious dangers by making a reasonable delegation of that duty to an independent contractor. *Id*. at 416. Such a delegation may be reasonable (1) if it is "explicit in nature and the scope requires the independent contractor to assume the duty of exercising reasonable care to make the land safe for entry, meaning the delegation anticipates the harm of known or obvious dangers"; and (2) if "the landowner exercises reasonable care in selecting a competent contractor with the proper experience and capacity to work in the presence of a known or obvious danger." *Id*. at 415.

      b.    Analysis

There is no dispute that Weyerhaeuser owed Payne a duty as a business invitee to make its premises safe. The question is whether Weyerhaeuser delegated this duty to Safway, and if

so, whether the delegation was reasonable. *Eylander*, 2 Wn.3d at 409. Weyerhaeuser delegated its duty through its contract with Safway, in which Safway agreed to prepare an extensive loss/safety plan and ensure compliance with WISHA and Weyerhaeuser's safety requirements. Because Safway accepted the terms of the contract, Weyerhaeuser "unambiguously and explicitly" delegated its duty to Safway to exercise reasonable care to make Tank #2 safe for entry. *Eylander*, 2 Wn.3d at 415.

It also is clear that Weyerhaeuser's delegation to Safway was reasonable. The record reflects that Safway held itself out as a professional scaffolding company that was capable of assuming the delegation. Weyerhaeuser first hired Safway to perform scaffolding work in 2008, three years before Payne's accident. Nothing in the record suggests that Weyerhaeuser had any reason to question Safway's professionalism or specialized knowledge about installing scaffolding inside its tanks. There is no indication that Weyerhaeuser acted unreasonably when it relied on Safway's expertise to protect against the dangers posed by working in Tank #2.

Payne argues that this case is similar to *Mihaila*, in which there was an open and obvious danger and a genuine issue of material fact existed as to whether the defendant should have anticipated harm. However, as discussed above, under *Eylander* Weyerhaeuser owed Payne no duty because it reasonably delegated the duty to Safway.

Accordingly, we hold that Safway's premises liability claim fails.

D.     RES IPSA LOQUITUR CLAIM AGAINST WEYERHAEUSER

Payne argues that Weyerhaeuser is subject to negligence liability for Payne's injury under the doctrine of res ipsa loquitur. We disagree.

A plaintiff may succeed in asserting a negligence claim based on res ipsa loquitur if "(1) the accident or occurrence that caused the plaintiff's injury would not ordinarily happen in the

absence of negligence, (2) the instrumentality or agency that caused the plaintiff's injury was in the exclusive control of the defendant, and (3) the plaintiff did not contribute to the accident or occurrence." *Curtis v. Lein*, 169 Wn.2d 884, 891, 239 P.3d 1078 (2010).

The issue here is the second requirement, whether Weyerhaeuser retained exclusive control over Tank #2 such that it could be found liable under res ipsa loquitur. While it is true that Weyerhaeuser was in charge of cleaning the chlorine dioxide out of the tank before Safway performed its work, it did not have *exclusive* control of the tank at the time of Payne's incident. As noted above, the Weyerhaeuser employee left Tank #2 after he completed the initial atmospheric test. After that, a Safway employee was in control of the tank.

Payne argues that the chlorine dioxide is the instrumentality that caused his injury, and that Weyerhaeuser had exclusive control over the neutralization of chlorine dioxide in Tank #2. While it is true that it was Weyerhaeuser's exclusive responsibility to neutralize the chlorine dioxide in Tank #2, we disagree that the existence of chlorine dioxide alone was the instrumentality that caused Payne's injuries. The instrumentality was the chlorine dioxide existing in the confined space in which Payne and his colleagues were sent to work. And Safway exercised control over whether or not Payne should enter the tank, not Weyerhaeuser.

Accordingly, we reject Payne's res ipsa loquitur claim.

E.    DESIGN DEFECT CLAIM AGAINST ISC

Payne argues that the trial court erred in granting summary judgment in favor of ISC because the trial court erroneously ruled that Payne failed to present specific evidence of a defective condition in the GBP monitors. We agree.

1.  Legal Principles

RCW 7.72.030(1) states, "A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed." In general, under this statute "a plaintiff must show that (1) a manufacturer's product (2) was not reasonably safe because of its design or because of lack of adequate warnings or instructions, which (3) caused harm to the plaintiff." *O'Connell v. MacNeil Wash Systems Limited*, 2 Wn. App. 2d 238, 246, 409 P.3d 1107 (2017).

RCW 7.72.030(3) states, "In determining whether a product was not reasonably safe under this section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." A plaintiff may rely on this "consumer expectations" test to show that a product was not reasonably safe as designed. *O'Connell*, 2 Wn. App. 2d at 250. Under this test, "the plaintiff must show the product was more dangerous than the ordinary consumer would expect." *Id.* at 251.

Some factors courts consider in determining whether a product is more dangerous than the ordinary consumer would expect include "the intrinsic nature of the product, its relative cost, the severity of the potential harm from the claimed defect, and the cost and feasibility of minimizing the risk." *Higgins v. Intex Recreation Corp.*, 123 Wn. App. 821, 828, 99 P.3d 421 (2004). Expert testimony of the exact defect is not required to succeed under the consumer expectation test. *Pagnotta v. Beall Trailers of Oregon, Inc.*, 99 Wn. App. 28, 39, 991 P.2d 728 (2000).

> "When the jury reasonably can find that the product is unchanged from the condition it was in when sold and the unusual behavior of the product is not due to any conduct on the part of the plaintiff or anyone else who has a connection with the product, logic dictates that it is a distinct possibility that there is some defect in the product."

*Id.* at 38 (quoting *Brownell v. White Motor Corp.*, 260 Or. 251, 258, 490 P.2d 184 (1971)).

  2. Analysis

  ISC does not dispute that it manufactured the GBP monitors and does not contest that – viewing the evidence in the light most favorable to Payne – their failure to alarm caused harm to Payne. The question is whether the monitors were "not reasonably safe" because of their design under RCW 7.72.030(1) and (3). *See O'Connell*, 2 Wn. App. 2d at 246.

  The purpose of the GBP monitors was to alert Payne and his coworkers to unsafe levels of chlorine dioxide inside Tank #2. Payne and his coworkers expected the monitors to alarm when exposed to levels of chlorine dioxide above the alarm set points. On the day of the accident, the alarm set points for the monitors were at 0.20 ppm and 0.50 ppm. Two of the GBP monitors recorded chlorine dioxide levels as high as 0.61 and 1.02 ppm. However, neither of those monitors went into alarm until after Payne exited the tank after working inside for 30 to 40 minutes. And the remaining two monitors did not record any chlorine dioxide in the atmosphere at all on the day of Payne's exposure.

  Payne testified that he could smell chlorine inside the tank. This fact indicates that there may have been concentrations of at least 0.30 ppm of chlorine dioxide in the tank. Finally, other Safway employees commented that the men smelled like chlorine when they exited Tank #2.

  The nature of the GBP monitors is to alert users to levels of chemicals in the atmosphere. The severity of harm from the claimed defect in this is great – Payne was diagnosed with upper airway injuries after his exposure to chlorine dioxide in Tank #2. Accordingly, we hold that genuine issues of material fact exist as to whether the monitors were unsafe due to their design.

ISC argues that we should reject Payne's claims because he did not provide evidence of a specific defect within the GBP monitors. ISC claims that Payne bears the burden of presenting some evidence of defect, and that he has failed to meet that burden.

ISC relies on *Bombardi v. Pochel's Appliance & TV Company*, in which the court stated, "We must emphasize that the mere fact of an accident, standing alone, does not generally make out a case that a product was defective." 10 Wn. App. 243, 246, 518 P.2d 202 (1973). However, in the next sentence the court stated, "On the other hand, there are some accidents as to which there is common experience dictating that they do not ordinarily occur without a defect, and as to which the inference that a product is defective should be permitted." *Id.*

The court then quoted an Oregon Supreme Court case:

> "In the type of case in which there is no evidence, direct or circumstantial, available to prove exactly what sort of manufacturing flaw existed, or exactly how the design was deficient, the plaintiff may nonetheless be able to establish his right to recover, by proving that the product did not perform in keeping with the reasonable expectations of the user. When it is shown that a product failed to meet the reasonable expectations of the user the inference is that there was some sort of defect, a precise definition of which is unnecessary. If the product failed under conditions concerning which an average consumer of that product could have fairly definite expectations, then the jury would have a basis for making an informed judgment upon the existence of a defect."

*Id.* at 247 (quoting *Heaton v. Ford Motor Co.*, 248 Or. 467, 471-72, 435 P.2d 806 (1967)).

In *Bombardi*, a television set caught on fire and damaged the plaintiffs' home. *Id*. at 246. The plaintiffs provided evidence that they saw smoke coming from the television, they called three expert witnesses who agreed that the television set was the cause of the fire, and they showed that the set was substantially in the same condition as when it left the manufacturer's possession. 10 Wn. App. at 245-46. However, it was impossible to determine the exact part that malfunctioned. *Id.* at 244-45. The court concluded, "Under these circumstances, the conclusion

is inescapable that the television was defective because it performed in an unreasonably dangerous manner, and in a manner uncontemplated by any user or consumer." *Id.* at 246.

Here, Payne showed that the GBP monitors failed to go into alarm when exposed to levels of chlorine dioxide above the alarm set points. In other words, the monitors did not meet the expectations of an ordinary consumer. And failing to alarm is the type of result that ordinarily would not occur in the absence of a defect. Further, Payne also provided expert testimony from Dr. Atwood in support of his claim that the monitors did not work as a reasonable consumer would expect. Therefore, we conclude that Payne presented sufficient evidence of a defect within the GBP monitors.

ISC also argues that Payne failed to meet his burden of proof because he did not show that the GBP monitors were defective when they left ISC's control. ISC relies on the general rule in older strict liability cases that a product liability plaintiff must prove that the product was defective when it left the manufacturer's hands. *E.g.*, *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 142, 727 P.2d 655 (1986). However, all the cases ISC cites except one involved accidents that occurred before enactment of RCW 7.72.030, and that case simply quoted the rule stated in *Baughn* in a discussion of proximate cause. *See Fabrique v. Choice Hotels Int'l, Inc.*, 144 Wn. App. 675, 682-83, 183 P.3d 1118 (2008).

No case has stated that there is a requirement under the consumer expectations test stated in RCW 7.72.030(1) and (3) that the plaintiff prove that there was a defect in the product when the product left the manufacturer's hands. Conversely, this court in *O'Connell* more recently did not include that requirement in stating what a plaintiff must show under RCW 7.72.030(1). 2 Wn. App. 2d at 246. This is consistent with common sense. A *design* defect – which subjects the manufacturer to liability under RCW 7.72.030(1) – must have occurred when the

manufacturer designed the product, which necessarily was before the product left the manufacturer's control. Therefore, we conclude that Payne was not required to present evidence that the design defect existed when it left ISC's control in order to avoid summary judgment.

The trial court suggested that ISC could not be held liable because the set points on the GBP monitors were different than when they left ISC's control. But the fact that Airgas adjusted the alarm set points after the monitors left ISC's control does not change the fact that the monitors still failed to alarm when exposed to levels of chlorine dioxide above the higher alarm set points.

We conclude that genuine issues of material fact exist as to whether the alleged failure of the GBP monitors to alarm rendered the monitors "unsafe to an extent beyond that which would be contemplated by the ordinary consumer." RCW 7.72.030(3). Accordingly, we hold that the trial court erred in granting of summary judgment in favor of ISC.

## CONCLUSION

We affirm the trial court's order granting summary judgment dismissing Payne's claims against Weyerhaeuser, but we reverse the trial court's order granting summary judgment dismissing Payne's claims against ISC and remand for further proceedings.

_____
MAXA, J.

We concur:

_____
VELJACIC, A.C.J

_____
CHE, J.

28